IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**,

        Plaintiff,

vs.

**CHRISTOPHER D. VILLALPANDO**,

        Defendant.

Case No.  08-CR-098-C

---

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS**

---

The thrust of the government's argument is that the police officer did not make any promises to Mr. Villalpando that he would be immune from prosecution if he cooperated with her, and, further, that even if the police officer did make those promises, the "defendant began incriminating himself before the officer made any of the promises. . ." (Government Memorandum pp. 4, 5).

        I.   <u>PROMISES WERE MADE FROM THE BEGINNING</u>.

The government states that Mr. Villalpando admitted to the officer that he had roaches in the living room of his residence (Government Memorandum p. 5) before any promises were made.  That is not the case.  Mr. Villalpando indicated that in response to a question from the detective that she found a little bag of weed in the car, Mr. Villalpando indicated that he "got some weed at my dad's house.  I think I got a little bit over there." (Transcript p. 7)  He went on to indicate that maybe he had "some roaches or something." (Transcript p. 8)   He further stated that there might be some roaches in that house. (Transcript p. 8)   The police officer indicated that she was not interested in what was at his father's house, but instead wanted to know what was at Mr. Villalpando's house.  He said there was no marijuana there. (Transcript pp. 8, 9)

It is true that Mr. Villalpando indicated in response to a direct question from the detective that he did have a safe in the house and that he had some money and a pistol there, too. (Transcript p. 9)   Immediately after saying that, the police officer said:

> See look how much progress we're making already, alright?  See and all you can do right now is put your trust in me.

(Transcript p. 9).  Trust in her about what?

The "trust" that the detective is referring to in that paragraph relates back to the time when the questioning began.  Initially, the detective told Mr. Villalpando:

> "Based on your cooperation we have some discretion with the District Attorney, okay.  They don't have to charge you, we don't have to send charges up.  We'd like your cooperation.  We'd like your help, okay.  Your probation officer I'm gonna have to talk to.  I'm gonna have to try and work this out with your PO. . . .  I know he's [the probation agent] not going to be happy that you've been living over there telling him that you're living on Leopold.  He won't be happy about that, but we can <u>also</u> smooth that out, okay.  I'm, what I'd like to do is have my boss call his boss and let them know that you're being cooperative.  We need your help.  It's not going to do anybody any good to have you locked up.

(Transcript p. 4)

The detective began making promises to him at the start of the interrogation.  She indicated that she did not have to charge him.  She was going to smooth this out with Mr. Villalpando's probation agent.  She told him it did no one any good to have him locked up.  He then in response to that said, "I don't want to go to jail for nothing.  If you're going to lock me up for this, then for having a bag of weed, then I guess you're going to have to lock me up for that you know." (Transcript p. 6)   The detective responded, "We don't have to do anything.  It's all <u>up to you</u>, you know–we got to get through to your PO, . . ." (Transcript p. 7)

The detective stated it was up to Mr. Villalpando whether he got charged or went to jail.  In other words, cooperate and you are not going to jail.

Shortly after that time, Mr. Villalpando stated that he had a pistol in his safe at his home. The detective stated that he was doing the right thing by putting his trust in her. She then got him to incriminate himself further. She told him she would keep him in school. Locking people up did not make her feel good. (Transcript p. 10)

She indicated after he told her about the pistol and the safe that she knew he was being straight with her. (Transcript p. 12) She indicated that if they were going to have an honest relationship, it had to be honest across the board, and "you're going to see how I uphold my end of the bargain." (Transcript p. 12) Her end of the bargain was no charge and no jail. A little bit later she said:

You've got to trust that I'm going to go to bat for you tonight.

(Transcript. p. 13)

This was the theme of the entire conversation between the two, that as long as he told her about items in his house, she would make sure that he found a way to stay out of jail. There is no doubt that Mr. Villalpando had some concerns about whether the detective could guarantee her promises. In response to his concerns, the detective blitzed him with assurances that he was not going to jail that evening. Those statements are included in the affidavit of the undersigned attached to the Motion to Suppress and do not need repeating here.

The government would like this Court to take pieces of the transcript and look at them as isolated incidents. However, this Court is to look to the totality of the circumstances when determining whether the confession was voluntary. A complete review of the transcript of the interview shows that the detective had every intention of not charging Mr. Villalpando and certainly not taking him to jail so long as he was truthful about what he had in his house. He was truthful, but the detective did not keep her promise.

## II. THE SEARCH WAS THE FRUIT OF THE POISONOUS TREE.

The government claims that nothing was addressed in the original memorandum about the fruit of the poisonous tree. The government wants to brief that issue

The search warrant and affidavit used to obtain the search warrant is attached to the original motion. The reasons stated in the affidavit for obtaining the warrant were that there were nine ounces of cocaine, a safe with a firearm in it, a digital scale in the kitchen, and an unknown amount of U.S. currency in Mr. Villalpando's house. The police knew nothing about those items until Mr. Villalpando told them so. Those statements were made only after numerous promises were made that Mr. Villalpando did not have to be charged, that charges did not have to go to the District Attorney's office, that the detective would smooth things out with his probation agent by having her boss call his boss, and that nothing had to be done that evening. It was after those promises were made to Mr. Villalpando that he incriminated himself. He did not do that before the promises were made, as the government would have this Court believe. As a direct result of his incriminating statements, the search warrant was issued. This is clearly fruit of the poisonous tree and should be suppressed, as well.

Dated this 21st day of October, 2008.

EISENBERG LAW OFFICES, S.C.

/s/ Mark A. Eisenberg
Mark A. Eisenberg
State Bar Number:  01013078
308 E. Washington Avenue
P. O. Box 1069
Madison, WI  53701-1069
Telephone:  (608) 256-8356
Fax:  (608) 256-2875
E-mail: mark@eisenberglaw.org
Attorneys for Defendant, Christopher D. Villalpando

4

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2008, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Meredith P. Duchemin, Assistant United States Attorney

/s/ Mark A. Eisenberg
Mark A. Eisenberg